IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HEATHER BAKER DAVIS,
        Plaintiff,

v.
                                    Civil Action No. 2:10CV30
                                        (Judge Bailey)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). For reasons recited

below, the undersigned finds substantial evidence does not support the Commissioner's decision in

this matter, and recommends the case be reversed and remanded for further proceedings.

### I.  Procedural History

Heather Baker Davis ("Plaintiff") filed her application for DIB on October 24, 2007, alleging

disability beginning December 2, 2006, due to a history of interstitial cystitis, migraines, chronic

depression, insomnia, and anxiety (R. 49, 137)[1]  The application was denied at the initial and

reconsideration levels (R. 51, 58).  Plaintiff requested a hearing, which Administrative Law Judge

("ALJ") Karl Alexander held on June 3, 2009 (R. 28).  Plaintiff, represented by counsel, testified on

her own behalf.  Gene Czuczman, a Vocational Expert ("VE"), also testified.  On July 28, 2009,

---

[1]Plaintiff refers to a claim for Social Security Insurance ("SSI") benefits in her Motion;
however, a review of the record shows only a claim for DIB.

the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from December 2, 2006, her alleged onset date, through March 31, 2007, her date last insured (R. 25).[2] The Appeals Council denied Plaintiff's request for review (R. 1), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Heather Baker Davis ("Plaintiff") was born on January 26, 1973, and was 34 years old on the date her insured status expired (R. 101). She finished high school in 1991, and has a bachelor's degree in Theology obtained in 2001 (R. 32). She has past work as a waitress (1993-1994), store clerk (1994-1996), store department manager (1996-1998), department store manager (1998-1999), and home health aide (for her grandmother, but for which she was paid, from 2004-2006) (R. 138). She had no reported work in the years 2001, 2002, or 2003, then began working for "Select In-Home Services, Inc." as a caregiver for her grandmother in 2004, 2005, and 2006, her last job (R. 113). She stopped working in December 2006 (R. 138).

On March 1, 2006, Plaintiff presented to Stanley Kandzari, M.D. a urologist, upon referral from Dr. Chua for a diagnosis of interstitial cystitis ("IC") (R. 234). She reported "typical symptoms" of IC– having to urinate frequently, sometimes every 30 minutes, and suprapubic pain. She had not been treated for IC yet. She also had a history of migraines and depression and was on Paxil for the depression.

On examination, Plaintiff had a dull pain in the right lower quadrant, but no CVA pain. Dr. Kandzari planned a cystoscopy, bladder biopsy and retrograde pyelograms. He gave her

---

[2]Pursuant to 42 U.S.C. 423(a),(c); 20 C.F.R. 404.101(a), and 404.131(a), the coverage period for an individual's claim for DIB extends only to her date last insured. Plaintiff must therefore show she was disabled on or before March 31, 2007.

prescriptions for Emiron and Detrol.

On March 1, 2006, Plaintiff underwent an abdominal scan for renal calculi (R. 238). The impression was that the evaluation was extremely limited, but there were no large calcifications overlying the left kidney. The right could not bee seen due to fecal material. There were multiple small calcifications within the pelvis, most of which were probably phleboliths. There was a linear radiopaque density projecting within the right lower quadrant of uncertain etiology, but atypical for the presence of a ureteral calculus.

On March 24, 2006, Plaintiff had a right retrophyelogram cystogram, which demonstrated multiple filling defects within the left ureter which could have represented air bubbles or stones. The overall appearance of the pelvis was unremarkable and showed no structural abnormalities.

On April 7, 2006, Plaintiff presented to S. Shehzad Parviz, M.D. for follow up from her cystoscope and for complaints of nasal congestion, a little sore throat, and nose bleeds (R. 217-218). Dr. Parviz noted Plaintiff's sleep habits were fine, she exercised regularly, and her diet was good. She had had gastric bypass surgery in 2003 and a complete hysterectomy in 1999. Her weight was currently 241 pounds. He described her as afebrile, alert and in no acute distress, well developed, well nourished, and attentive to grooming. Dr. Parviz diagnosed interstitial cystitis and sinusitis.

On April 12, 2006, Plaintiff followed up with Dr. Kandzari regarding her cystoscopy and bladder biopsies, which were consistent with interstitial cystitis (R. 233). She stated that she did not feel well and had a large amount of pain when she voided.

On May 1, 2006, Plaintiff presented to Dr. Parviz, with a chief complaint of needing her antidepressant medication back–"feeling like she's ready to have a nervous breakdown" (R. 215). Plaintiff reported having been depressed for 7 years. She was taking Paxil. She had not taken any

percocet for 5 days "as she did not need them." She denied any suicidal ideation or plan. "She never mentioned about depression in the previous visits with me. She says she is not sleeping well too." Dr. Parviz stated Plaintiff's depression SDS index was 79.0, and diagnosed depression. Plaintiff said she had side effects with Paxil (dry cough). She was given Effexor instead.

On May 5, 2006, Plaintiff followed up with Dr. Zazlau for follow up of her IC (R. 232). She reported voiding up to 20 times a day and 12 times per night. She had tried Emiron, Ditropan, and Detrol with no success. She was assessed with refractory urgency/frequency. The plan was for Plaintiff to undergo an InterStim trial and permanent implant.

On May 19, 2006, Plaintiff followed up with Dr. Parviz regarding her antidepressant medication (R. 213). She said her depression had gotten better, but she was still having anxiety attacks, and felt she would benefit from a higher dose. She had no suicidal thoughts or plans. Dr. Parviz diagnosed depression and anxiety–improved, and increased her Effexor dosage.

On June 5, 2006, Plaintiff followed up with Dr. Zazlau, for follow up of her InterStim stage I trial (R. 231). She had been voiding about 25 times a day and 10 times per night before the trial, but now, one week later, was voiding about 10 times a day and up to 2 times at night. The doctor opined she was a least 50% better. Plaintiff herself believed she was 75% better. She was to get her Stage II implant when scheduling permitted.

On August 9, 2006, Plaintiff returned to Dr. Zazlau for follow up (R. 230). Her symptoms were dramatically improved; however, she was having some leakage from her wound. She was assessed with possible infection of the surgery site. She was prescribed an antibiotic and scheduled for an InterStim revision. She was prescribed Percocet for pain.

On August 28, 2006, Plaintiff followed up with Dr. Zazlau who noted dramatic improvement

4

in her symptoms, but still possible infection (R. 229). She was scheduled for the InterStim revision.

On August 29, 2006, plaintiff underwent the InterStim revision. It was noted she had a successful stage II InterStim device placed a couple weeks earlier, and was noting marked improvement until a recent fall where she experienced some numbness and the InterStim device stopped working. She had the original removed and a new device implanted.

On September 12, 2006, Plaintiff presented to Dr. Parviz for medication refill (R. 211). She said her depression had been stable and Ambien helped with her sleep. Dr. Parviz diagnosed depression and insomnia.

On September 25, 2006, Plaintiff presented to Dr. Zazlau for follow up post InterStim stage II revision (R. 228). She was doing well with no complaints, and reported she was 90% better. She was still having pain and the doctor prescribed Lortab, and planned to see her back in a few months.

On October 10, 2006, Plaintiff presented to Dr. Parviz with a chief complaint of headache on and off for 6 weeks, with an ER visit about two weeks earlier (R. 209). She reported headache lasting for 24 hours, associated with nausea and vomiting and "nearly disabling." Her pain went up to 10 out of 10 in severity and she had light sensitivity with the headache. She said she used Imitrex for 7 years, but it no longer helped and Replax gave her vomiting. Dr. Parviz diagnosed migraine headaches and prescribed Phenergan and percocet.

On November 1, 2006, Plaintiff presented to the ER with complaints of vomiting for the past 18 hours (R. 273). She was diagnosed with gastroenteritis. In the following days she again presented to the ER for complaints of vomiting, diarrhea, and headaches.

On December 1, 2006, Plaintiff returned to Dr. Zazlau for follow up of her IC (R. 227). She reported having recently been hospitalized for the flu with dehydration. She reported voiding about

15-20 times a day and as many as three times per night. The doctor reprogrammed her InterStim, continued her Lortab prescription, and had her follow up in three months.

Plaintiff's alleged onset date is the next day, December 2, 2006.

On January 23, 2007, Plaintiff presented to the ER with complaints of migraine headache (R. 260).

On February 5, 2007, Plaintiff followed up with Dr. Zazlau for pain medication refills (R. 226). She was to see him back in a month.

On February 23, 2007, Plaintiff presented to the ER with complaints of migraine headache for 4 days (R. 257).

On February 27, 2007, Plaintiff followed up at the Belington Clinic for her migraine headaches (R. 242). It was her first visit there. She complained of poor sleep and increased migraine frequency. Examination was unremarkable. The doctor requested prior records and tests, and diagnosed uncontrolled migraines, and referred her for an appointment with a neurologist.

On March 12, 2007, Plaintiff returned to Dr. Zazlau for follow up (R. 225). She was "doing well," voiding about 10 times a day and 4 times at night, which was still 50% better than her original symptoms. She was prescribed Lortab.

Plaintiff's date last insured is March 31, 2007. All records subsequent to this date are noted only for background information.

On April 4, 2007, Plaintiff presented to the ER with complaints of migraine headache for five days (R. 252). She followed up with the Belington Clinic, where she reported decreased migraines on elavil but had new headaches because she had no prescription. She would be unable to attend the neurological examination due to lack of finances. She was given trials of prescriptions and diagnosed with improved chronic headaches.

On April 11, 2007, Plaintiff followed up with Dr. Zazlau (R. 224). She was still voiding about 10-12 times a day and 4 times at night, which was still 50% better than her original symptoms. Dr. Zazlau refilled her Lortab.

On May 9, 2007, Plaintiff followed up with Dr. Zazlau, reporting voiding about 8-10 times a day, and a few times at night (R. 223). Her Lortab was refilled.

On June 1, 2007, Plaintiff followed up with Dr. Zazlau, reporting her symptoms were "well controlled" and she was "doing well" (R. 222). She returned for refill of her pain medications.

On July 24, 2007, Plaintiff followed up at the Belington Clinic reporting a migraine for 4 days with no current prescription medications (R. 240). She wanted to discuss antidepressants. Her mood was depressed and her affect subdued. She was diagnosed with poorly controlled depression and migraine, and prescribed celexa and wellbutrin and toradol.

On September 10, 2007, Plaintiff followed up with Dr. Zazlau, still reporting her symptoms were "well controlled" and she was "doing well." She returned for refill of her pain medications, which was provided. She was to return in three months.

On October 22, 2007, Plaintiff presented to the Belington Clinic for a routine checkup and follow up of depression and migraines (R. 239). She had no new complaints. She had good control of her depression and fair control of anxiety symptoms. Her mood was somewhat depressed. The diagnosis was depression and anxiety, otherwise stable.

Plaintiff filed her application for disability on October 24, 2007.

On October 26, 2007, Plaintiff presented to the ER with complaints of migraine headache for two days (R. 244). She underwent a CT scan of her head which results were negative (R. 248).

In Plaintiff's Disability Report submitted in November 2007, she reported:

7

> I cannot work because I do not sleep I got to the bathroom sometimes up to 6 times or more an hour. It is very hard to stay on task and keep things organized and straight. I have constant pain. I cannot sit, stand or lay down whenever I need to.

(R. 137). She said her last job was flexible because she was taking care of her grandmother which allowed her some flexibility on that job, but stopped working on December 15, 2006, because her condition had deteriorated to the point she had to take pain medicine on a continual basis.

In Plaintiff's original Function Report, she described her daily activities as:

> Get up, go to bathroom, eat breakfast, take meds, sit in chair, lay down, eat lunch, more meds, lay back down, eat supper, watch tv, more meds ,get ready for bed. All thru the day, about 4-6 x's an hour going to bathroom.

(R. 145). She stated she did not take care of anyone else, and that the majority of care fell on her 14-year-old daughter. She did not sleep due to urgency and frequency of urination causing multiple trips to the bathroom, along with constant pain waking her up.

Plaintiff said she only went out once or twice a week, and could drive a car or ride in a car, although she did not go out alone because her medications made her dizzy and groggy. She shopped in stores about 1-2 times a month. It took her several hours riding in a motorized cart. Otherwise she shopped by mail and by computer. She stated she needed special reminders to shower and change her clothes, and to take her medications. She prepared her own meals, consisting of frozen dinners or peanut butter sandwiches, but only about once a week. She folded clothes after someone else did the laundry. Someone else also put away the laundry. She had begun making careless mistakes, losing receipts. She watched television and read when she could concentrate, and scrapbooked, knitted, or crocheted 1 to 2 times per month. She talked to others via phone and email. She attended church on a regular basis, but no longer participated in other activities.

Plaintiff reported she could not lift over 10 pounds, stand for more than 15 minutes, sit for

more than 15 minutes, walk for more than 15 minutes, and had pain in pelvis from squatting, bending, kneeling. Medications caused problems with memory, concentration, understanding and following instructions. She could pay attention only about 30 minutes, and did not follow written or spoken instructions well. She tried to avoid people in authority and handled stress "badly." Changes in routine "mess[ed her] up."

Plaintiff noted that her inability to sit or stand for more than 15 minutes caused her to miss out on her family activities. Her medications caused her to be sleepy and tired a lot.

On December 10, 2007, just a year from her alleged onset date, Plaintiff reported her urinary symptoms were well controlled (R. 352). She had no complaints in terms of pain medication. She was prescribed Lorcet, and told to come back in three months.

On January 21, 2008, Plaintiff underwent a Mental Status Examination performed by Thomas Stein, Ed.D. at the request of the State Disability Determination Service (R. 278). Plaintiff's chief complaint was that she took medications for depression and anxiety, and they made her very sleepy. She also reported panic attacks that came suddenly, so she could not leave her home. She also had IC causing constant pain and needed to use the bathroom a lot. The pain medications made her groggy and uncoordinated and she was not safe doing anything. On bad days the IC made her use the bathroom 8-10 times an hour. She was also depressed and had suicidal thoughts and some days she did not get dressed or even get out of bed for weeks at a time. She had horrible migraines a couple times a month, that last for three to five days each.

Plaintiff reported sleep disturbances, difficulty falling asleep, and frequent awakening; frequent indigestion; crying episodes two or three times a week; poor energy level; and grumpy mood. She reported being phobic about public places and had panics attacks at least once a day. She

compulsively checked her door after 9:00 pm, and compulsively cleaned the toilet several times a day. She reported child sexual abuse that lasted three years and a rape in her teens that caused traumatization. She reported flashbacks, hypervigilance, and nightmares.

On Mental Status Examination Plaintiff was cooperative, polite and subdued, other than fidgeting with her fingers. She maintained fair eye contact and adequate verbal responses. She displayed no sense of humor or spontaneous conversation. She was introverted with adequate conversation skills. She was fully oriented, speech was normal, mood was depressed and anxious. Her immediate memory was mildly deficient and recent and remote memory were moderately deficient. Concentration was poor.

Plaintiff reported her daily activities as follows:

The claimant arises at 9 a.m., takes care of her personal hygiene, fixes and drinks hot chocolate, takes prescription medications, fixes and eats a light breakfast, watches television, and will read a magazine. Then she fixes and eats lunch, takes more medications, gets dressed, watches more television, folds any laundry, and then she takes a two-hour nap. After that, she showers, dresses again, visits with her daughter who has returned from school, talks with the spouse as he prepares the family supper, and eats with her family at 6 p.m. In the evenings, she watches television, takes more prescription medications, and retires to bed by 11 p.m.

The claimant handles her personal hygiene without assistance, She occasionally cooks and washes dishes, and rarely cleans or does laundry. She does not do yard work, gardening, or automobile mechanic work. She occasionally grocery shops with the help of someone else, and occasionally runs errand with the help of someone else. She rarely drives, rarely walks, occasionally sits on the porch and occasionally reads. She collects teapots. She occasionally crochets.

(R. 281-282).

Regarding Social Functioning, Dr. Stein found Plaintiff moderately deficient. Her concentration and pace were moderately deficient and her persistence mildly deficient.

Objectively, Dr. Stein found Plaintiff cooperative, polite, and subdued, with depressed mood,

10

constant finger play, average intelligence, average judgment, average memory, and poor concentration.

Dr. Stein diagnosed Posttraumatic Stress Disorder, chronic type; Panic Disorder with agoraphobia; and Major Depressive Disorder, recurrent, nonpsychotic (R. 281).

State agency reviewing psychologist Frank Roman completed a Psychiatric Review Technique ("PRT") on January 29, 2008, finding Plaintiff had an affective disorder and anxiety disorder, but neither was severe (R. 283). He found she would have only mild degrees of limitation in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (R. 293).

On January 29, 2008, State agency Medical consultant Leesa Chalmers completed a Physical Residual Functional Capacity Assessment ("RFC") finding that Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday (R. 163). She would have no other functional limitations. Ms. Chalmers found that Plaintiff's allegations and symptoms were fairly consistent with her medical records and physical findings, and she was felt to be credible (R. 167).

Ms. Chalmers commented:

The claimant has a history of interstitial cystitis. It has been controlled to some extent with an interstim stage II device in place. Her 3/2007 progress note says she is doing well and voiding about 10 times a day and four at night. She also takes pain medicine. The claimant also has a history of treatment for migraine headaches which have been difficult to control.

(R. 169).

Plaintiff's application for DIB was denied at the Initial level on January 29, 2008.

On February 22, 2008, Dr. Zazlau wrote a "To Whom is May Concern" letter, stating that Plaintiff qualified under the ADA due to her underlying condition, refractory urgency, frequency, and interstitial cystitis (R. 297). He opined she had a "profound voiding dysfunction," voiding as many as 10 to 15 times per day resulting in constant work interruption and waking up anywhere from 4 to 7 times per night, resulting in fatigue. In addition, he noted that patients with the disease often experienced significant chronic pelvic pain for which Plaintiff took pain medication. Over the past year, she had multiple urinary tract infections. She had an InterStim in place, and "[s]ymptoms are well controlled at this point," however, the InterStim makes working conditions a very significant challenge. Dr. Zazlau opined that for Plaintiff to work effectively, she would need an employer that would tolerate her chronic need to void anywhere between 10 and 30 times per day. She would need to have a bathroom nearby, and be afforded unlimited bathroom privileges.

On March 3, 2008, Plaintiff followed up with Dr. Zazlau for medication refills (R. 351).

On March 6, 2008, Plaintiff's husband wrote a letter to Social Security stating:

My name is Danny Davis and I am the husband of Heather Davis. My wife was diagnosed with I.C. approx. 2 years ago. When before that time, my wife was in constant pain and having to go the bathroom many, many times while I saw this while being home. After many months of seeing many doctors, to no avail, she lucked up on Dr. Stanley Zazlau. After the diagnosis of IC life has been Hell! You and the people making the decision about this crippling disease do not have a clue about how hard it is on us. All I want to tell you is how it has affected me and my 14 year old daughter, and my wife. When you can't even plan trip to see her father who had a stroke that is really bad because she would have to take a portable potty and take so much pain medicine because the pain is so bad that is HELL! It is bad when in the last 2 ½ years you have only made love to your wife 3 times, that is Hell on her and on me; when you can't sleep but 30 min. at a time that is also hell on her and me. When you spend 10 hours out of a 12 hour day in the bed and bathroom which is Hell on the whole family. My wife can't even do anything with our daughter and my daughter has become very distant towards her own mother. This is an outrage! At times my wife has considered suicide on a weekly basis because and

12

I quote, "I put too much of a burden on you and Megan." Please reconsider your decision on this matter. With the disability she can get the additional medical help that she NEEDS!!!

(R. 170). Plaintiff's daughter also wrote:

My name is Megan Davis, and I am 14 years old. I am the daughter of Heather Davis. Living with my mom since she was diagnosed with I.C. has been a big strain on my life and our relationship. Since I was approximately 11, things began to change. She had to go to a lot of doctors and to the hospital while she was trying to parent me. Not only was she trying to he a parent, she also was trying to be a teacher to me as well. She always has to go to the bathroom and she has to stay in the bed for hours because her pain is so bad.

I wish we could have the relationship we use to have but because of the disease, she isn't the same. She cannot be as big a part of my life as she wants to or use to be. I miss my mom! I hope she is able to get her disability because she will be able to see the doctors she needs to and get the medicines and therapy she needs but we can't afford.

(R. 171) (Emphasis in original).

On March 7, 2008, Plaintiff completed a Disability Report–Appeal, stating that since her last report of December 2007, her IC caused her to spend most 90% of her day in bed and the pain and number of times she went to the bathroom increased by about 60%.

On March 21, 2008, Plaintiff presented to Jeffrey Harris, DO for follow up of her depression and migraines (R. 326). She stated the Celexa was making her more depressed. Effexor worked better, but she could not afford it. She had a history of anxiety and panic attacks. She had headaches approximately 1-2 times per months (R. 176).

On April 7, 2008, Plaintiff followed up with Dr. Zazlau for refill of her pain medications (R. 350). She said Lortab was not working well, and was prescribed Percocet.

On April 17, 2008, State reviewing psychologist Phillip Comer, Ph.D. completed a Mental RFC assessment finding Plaintiff moderately limited in her ability to understand, remember and carry

out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public and supervisors; and respond appropriately to changes in the work setting (R. 298-299).

Dr. Comer also completed a PRT finding Plaintiff had an affective disorder and anxiety disorder resulting in a mild restriction of activities of daily living; and moderate difficulties in maintaining social functioning and concentration, persistence or pace (R. 312). He found her credible, but also found she had the mental/emotional capacity for work-related activity in a low stress/demand work environment that had minimal requirements for social interaction and sustained concentration.

That same date, State agency reviewing physician Cynthia Osborne completed an RFC opining Plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour day; and sit about 6 hours in an 8-hour day (R. 317). She could occasionally climb, stoop, kneel, crouch and crawl, and frequently balance. She should avoid concentrated exposure to extreme cold and fumes, gases, etc.

Dr. Osborne particularly noted Plaintiff's last reports of ADL's were completed well after her date last insured and were not consistent with reports to her treating physicians. Notes at the time indicated she was under good control and doing well. Some limitations were to be expected due to pain, medications, and voiding frequency, but claimant was only partially credible.

Considering her history, treatment and discomfort, her RFC should be decreased to light with limitations noted.

On April 18, 2008, Plaintiff's application for DIB was denied at the Reconsideration level.

On May 5, 2008, Plaintiff followed up with Dr. Zazlau, at which time there were no complaints listed and her urinary problems were found to be "stable." On June 2, 2008 and August 4, 2008, Plaintiff followed up with Dr. Zazlau, for refills of pain medication (R. 349). There were no complaints listed.

On August 19, 2008, Plaintiff presented to Appalachian Community Health Center for suicidal ideations (R. 335). She reported first noticing mental health symptoms in 1998. She was diagnosed with endometriosis and cancer at age 25 and had had a hysterectomy. She reported insomnia and depression. Her depression intensified three years ago. She had three miscarriages in the past. She had kidney problems, then was diagnosed with I.C. She had a bladder stimulator and was only out of bed for an hour per day. She was always in pain. She could not be intimate with her husband. She was agitated and annoyed by the depression and experienced panic attacks. When she left the house she would become nervous and have panic attacks due to the health problems. She was recently planning to overdose due to stress and depression.

Plaintiff reported not having a relationship with her father, reporting he had been emotionally and verbally abusive to her.

Plaintiff was well groomed. She slept two to three hours per night and two to three hours in the afternoon daily. She had a plan to overdose. Her affect was broad and she had an agitated and sad mood. Her short term memory was poor and her long term memory was intact. She was fully oriented. Her only source of income was her husband's Social Security Disability and her daughter's

15

Social Security Insurance. She was diagnosed with major depressive disorder, recurrent, moderate, generalized anxiety disorder, adjustment problems, and GAF 63.[3]

On September 5, 2008, and October 3, 2008, Plaintiff followed up with Dr. Zazlau, for refills of pain medication (R. 349). There were no complaints listed.

On January 5, 2009, Plaintiff presented to Dr. Zazlau for pain medication management (R. 343). She had no new issues and was "currently satisfied with her urologic condition."

On January 26, 2009, Plaintiff presented to psychiatrist Greenbrier Almond, M.D. for a Comprehensive Psychiatric Diagnostic Interview examination (R. 330). Plaintiff reported her husband was on Social Security Disability and her daughter was on SSI. Her support system included her parents and her father was a Baptist minister in the area. Her chief complaint was listed as a history of suicidal ideation and planned overdose. She described her pain as 15 on a scale of 0-10 with 10 being unbearable. She currently had no suicidal ideation. On Mental Status Examination, she was cooperative and appeared to be in some physical distress. She could sit through the hour interview without going to the bathroom, though she was told she could at any time. Her speech was relevant and coherent, but soft to the point he had to turn off the heating unit. She appeared meek and mild.

On March 24, 2009, Plaintiff presented to psychiatrist Dilip Chandran for follow up of her mental impairments (R. 327). She felt better in general but had some difficulty with initial/middle insomnia. Upon examination, Plaintiff was pleasant and cooperative. She appeared slightly

---

[3]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

fatigued. She was not depressed, angry, irritable or anxious. Her affect was appropriate. She had no suicidal ideations. She had been diagnosed with mood disorder secondary to interstitial cystitis, insomnia/anxiety.

Plaintiff said she busied herself by home-schooling her daughter, and remaining as active as possible by organizing an interstitial cystitis group "which apparently has some national focus." She slept about four hours per night with many interruptions. She forgot so much that she used five calendars and still did not remember. Dr. Greenbrier diagnosed mood disorder, secondary to interstitial cystitis, being a cancer survivor, and obesity surgery (R. 333). Although her social support was good, she was living in relative poverty. He assessed her GAF at 50.[4] He would prescribe Prozac, which she believed would help her, and which she reported both her husband and daughter took.

The administrative hearing was held on June 3, 2009, more than two years after Plaintiff's date last insured. Plaintiff testified that her most serious problem was that she had to go to the bathroom "all the time" (R. 36). It was constant, at least once, twice, three times an hour on a fairly decent day, but most of the time eight or ten times an hour. On bad days, which occurred 15 or 20 times a month, she would need to go to the bathroom 15 to 20 times per hour (R. 42). She had panic attacks twice a day, and constant depression (R. 38).

The Vocational Expert testified that there would be no problem placing Plaintiff in an office job close to a bathroom (R. 47). If she had to go to the bathroom 4-5 times in an hour, even though the bathroom was close, however, no jobs would exist she could perform.

---

[4]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On July 1, 2009, one month after the hearing, Plaintiff presented to psychiatrist Chandran for pharmacological management (R. 354). She had no complaints. Objectively, her mood was stable, with no depressive features or symptoms, and no anxiety attacks. She was diagnosed with a mood disorder.

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, ALJ Alexander made the following findings:

1.   The claimant last met the insured status requirements of the Social Security Act on March 31, 2007. (Exhibit 2E2).

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 2, 2006 through her date last insured of March 31, 2007 (20 CFR 404.1571 et seq.).

3.   From December 2, 2006 through the date last insured of March 31, 2007, the claimant had the following medically determinable impairments that, either individually or in combination, were "severe" and significantly limited her ability to perform basic work activities: interstitial cystitis; migraine headaches; Manic Depressive Disorder; Anxiety Disorder; and Post-Traumatic Stress Disorder (PTSD)(20 CFR § 404.1520(c)).

4.   From the alleged onset date of December 32, 2006 through the date last insured of March 31, 2007, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.   From December 2, 2006 through the March 31 2007, date last insured, the claimant has had only the residual functional capacity to perform, within a low stress environment, a range of unskilled work activity that: requires no more than a "light" level of physical exertion; affords the option to sit or stand; allows performance of postural movements only occasionally, but no climbing of ladders, ropes or scaffolds; entails no exposure to temperature extremes, wet/humid conditions, or hazards; entails no production line type of pace or independent decision making responsibilities; involves only routine, repetitive instructions and tasks; requires no interaction with the general public and no more than occasional interaction with supervisors and

coworkers; and can accommodate the employee by placing her close to the bathroom.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant is appropriately considered for decisional purposes as a "younger individual" (20 CFR §§ 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.      The claimant was not under a "disability," as defined in the Social Security Act, at any time from December 2, 2006, the alleged onset date, through March 31, 2007, the date last insured (20 CFR §§ 404.1520(g)).

(R. 17-26).

## IV. Contentions

A.      Plaintiff contends:

1.      The Commissioner erred as a matter of law by discounting the Plaintiff's credibility without providing specific reasons supported by the evidence in the case record.

2.      The ALJ erred as a matter of law by finding that the Plaintiff is capable of work that exists in substantial numbers in the national economy.

3.      The Commissioner erred as a matter of law by failing to give appropriate weight to the interstitial cystitis diagnosis.

B.      The Commissioner contends:

1. Substantial evidence supports the ALJ's credibility determination.

2. The ALJ properly relied on Vocational Expert Testimony; The ALJ incorporated all of Plaintiff's credibly established functional limitations in the RFC assessment.

3. The ALJ properly evaluated Plaintiff's interstitial cystitis.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Threshold Matter

As a threshold matter, the undersigned notes with some concern that at the time of the administrative hearing, held more than two years after Plaintiff's date last insured, both the ALJ and

Plaintiff's counsel appear to have been treating this claim as one for SSI or for both SSI and DIB. For example, at the start of the hearing, the ALJ stated: "Now, the issue we are considering today is whether or not you are under a disability as defined under the Social Security Act and the applicable Regulations" (R. 31)(emphasis added). At no time does the ALJ mention that the claim involves only the brief time frame from December 2006 through March 2007, more than two years earlier. Plaintiff's counsel then proceeds to question Plaintiff only regarding her current symptoms, asking her to describe her most serious problem that she deal(s) with daily, in the present (R. 36). He asked how often her panic attacks occurred in the present. He asked her what a typical day was like. The ALJ asked no questions of Plaintiff. At no time were any questions asked regarding Plaintiff's symptoms during the relevant time. Further, Plaintiff's treating physician wrote a letter addressing Plaintiff's symptoms in early 2008, almost a year after her date last insured, but did not at any time discuss what her symptoms were during the relevant time frame.

The ALJ's Decision is based solely on a DIB claim, the relevant time period being December 2, 2006 through March 31, 2007. There is no evidence in the record that this case involves anything other than a claim for DIB. Plaintiff's counsel acknowledges in her appeal to the Appeals Council that this is solely a DIB claim. In Plaintiff's Motion for Summary Judgment, however, counsel begins by stating that this is a claim for both DIB and SSI (Plaintiff's brief at 3). Despite the fact the relevant time frame ended in March 2007, counsel argues that Plaintiff's conditions has worsened, especially with respect to her depression, as evidenced by her being referred to the hospital for suicidal ideations in August 2009.

The Court must decide this case based on evidence regarding Plaintiff's alleged limitations from December 2006 through March 2007, but acknowledges not much evidence is in the record regarding this brief time, and more significantly, no questions were asked regarding this time frame.

## C. Credibility

Plaintiff first argues that the Commissioner erred as a matter of law by discounting her credibility without providing specific reasons supported by the evidence in the case record. Defendant contends substantial evidence supports the ALJ's credibility determination. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

Plaintiff argues in particular that the ALJ "ignore[d] his duty to consider the consistency of the claimant's statements," citing Social Security Ruling ("SSR") 96-7p. Plaintiff argues that "the record provides ample documentation of consistent statements made by the claimant . . . ." and that "[i]f consistency in an individual's statements is to be considered a strong indication of credibility, then Ms. Davis' pattern of consistent allegations and complaints should be deemed credible by the ALJ in the case at hand." (Plaintiff's brief at 7).

> SSR 96-7p provides, in pertinent part:
>
> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>
>> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>>
>> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each

prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

Here, the ALJ found there were inconsistencies between Plaintiff's reports to different providers and her testimony and functional reports. He found particularly significant Plaintiff's visits with her treating physician, Dr. Zazlau, from June 2006, through September 2007, six months before through six months after the time period at issue. In June 2006, Dr. Zazlau reported Plaintiff was voiding about 10 times a day (an average of about once every 1 ½ hours in a 16-hour day) and up to two times at night. Plaintiff herself reported she was 75% better. In early August 2006, she reported her symptoms had dramatically improved, and in late August Dr. Zazlau reported the same. In September, she was "doing well with no complaints." On December 1, 2006, a day before her alleged onset date, she reported voiding 15-20 times a day, but notably, she had just had the flu with dehydration. On March 12, 2007, three weeks before her date last insured, Plaintiff reported voiding about 10 times a day and four times at night. Two months later, this had decreased to 8-10 times a day and a few times at night. On June 11, 2007, she indicated she was doing well, and on September 10, she said her symptoms were well-controlled and she was doing well.

Yet in Plaintiff's Disability Report submitted only two months later, she reported needing

23

to go to the bathroom up to 6 times or more per hour. In her Function Report filed that same time, she said that she went to the bathroom 4-6 times per hour "throughout the day." (64-96 times in a 16-hour period). This report is entirely inconsistent with her own reports to her own treating physician.

Then, only a month later, Plaintiff reported to her treating physician that her urinary symptoms were well controlled (R. 352). One month after that, she again reported her symptoms were well controlled. That very same month, however, she told the State Agency Examining psychologist that on bad days she used the bathroom 8-10 times an hour (128-160 times in a 16-hour day).

Although the ALJ did not discuss inconsistencies that occurred much after the Plaintiff's date last insured, a review of the record shows that on March 7, 2008, Plaintiff reported to Social Security that her IC caused her to spend 90% of her day in bed and the pain and number of times she went to the bathroom had increased by about 60% since her last report. Two months later, however, she followed up with Dr. Zazlau, at which time there were no complaints listed and her urinary problems were found to be "stable." On June 2, 2008 and August 4, 2008, Plaintiff followed up with Dr. Zazlau, for refills of pain medication (R. 349). There were no complaints listed.

On January 5, 2009, Plaintiff presented to Dr. Zazlau for pain medication management (R. 343). She had no new issues and was "currently satisfied with her urologic condition." Three weeks later she told Dr. Almond her pain was at level 15 on a scale of 1-10, with 10 being unbearable. Dr. Almond particularly noted that, although Plaintiff was told she could go to the bathroom at any time, she did not do so during the entire hour-long interview. Finally, at the hearing in June 2009, Plaintiff testified she had to go to the bathroom "all the time" (R. 36). It was constant,

at least once, twice, three times an hour on a fairly decent day, but most of the time eight or ten times an hour. On bad days, which occurred 15 or 20 times a month, she would need to go to the bathroom 15 to 20 times per hour.

The undersigned finds substantial evidence supports the ALJ's finding that Plaintiff's self-reports to her treating physician were inconsistent with her reports to Social Security. The undersigned also finds substantial evidence supports the ALJ's determination that Plaintiff's reports of her symptoms were not credible.

## D.  VE Testimony

Plaintiff next argues the ALJ erred as a matter of law by finding that the she  is capable of work that exists in substantial numbers in the national economy. Defendant contends the ALJ incorporated all of Plaintiff's credibly established functional limitations in the RFC assessment and properly relied on Vocational Expert Testimony.  Plaintiff in particular argues that the VE testified that no jobs would exist if Plaintiff's testimony was completely credible, if the medical evidence supported the exertional limitations, and if her depression affected her ability to concentrate.

The undersigned has already found substantial evidence supported the ALJ's determination that Plaintiff's reports of her symptoms were not credible.

Significantly, the time frame at issue in this case is very brief– from December 2006 through March 2007.  Although it is quite possible Plaintiff became much worse after that time, especially as regards her mental impairments, there is simply little to no evidence to support disabling exertional or mental impairments during this time.

On April 12, 2006, Plaintiff told her treating physician she did not feel well and had a large amount of pain when she voided.  Two months later, after her first InterStim trial, she told her

25

treating physician she was 75% better. By August 2006, she was "dramatically improved." By September 2006, she was 90% better, although still having pain, treated with medication. In November, Plaintiff was treated for the flu and dehydration. In December 2006, she reported that, since the hospitalization for flu with dehydration, she was voiding 15-20 times per day and as many as three times per night. The doctor reprogrammed her InterStim, continued her pain medication, and scheduled a follow up in three months. Her alleged onset date is the next day. By March 12, 2007, the last report prior to her date last insured, Plaintiff told her treating physician she was doing well, voiding about 10 times per day and 4 times at night, which was 50% better than her original symptoms. By June 2007, she reported her symptoms were "well controlled" and she was "doing well." She still reported "doing well" with "well controlled" symptoms in September 2007. On December 10, 2007, only one year from her alleged onset date, Plaintiff reported to her treating physician that her urinary symptoms were "well controlled." She had no complaints in terms of her pain medications.

During this same time period, Plaintiff began experiencing migraine headaches, for which she went to the ER twice during the relevant time frame. On February 27, 2007, she went to a clinic for the first time for her migraines. On April 4, 2007, after her date last insured, Plaintiff went to the ER for a migraine, at which time she reported she had had decreased migraines on Elavil but had new headaches because she had no prescription. She was given trials of prescriptions and diagnosed with improved chronic headaches.

On January 29, 2008, a State Agency Medical Consultant reviewed the record and completed an RFC finding that Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday. She

would have no other functional limitations. The consultant found Plaintiff's allegations were credible, and noted her March 2007 progress note said she was doing well and voiding about 10 times a day and four at night.

Despite Plaintiff's argument regarding exertional limits, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff could perform work at no more than a "light" exertional level during the time at issue.

Regarding her depression, again, the relevant time period is only from December 2006 through March 2007. In May 2006, Plaintiff told Dr. Parviz she needed her antidepressant medication back. Although she reported being depressed for seven years, the doctor stated she "never mentioned about depression in the previous visits with me." He diagnosed depression and prescribed Effexor. Later that same month, Plaintiff told Dr. Parviz her depression had gotten better, but she was still having anxiety attacks. Dr. Parviz diagnosed depression and anxiety–improved and increased her medication. In September, Plaintiff told Dr. Parviz her depression had been stable and Ambien helped her sleep. This is the last record of any mental impairment evaluation or treatment prior to Plaintiff's date last insured. Four months after her DLI, she went to the clinic wanting to "discuss antidepressants." She was given prescriptions. In October 2007, she had good control of her depression. On January 29, 2008, State agency reviewing psychologist Frank Roman found Plaintiff would have only mild degrees of limitation in activities of daily living, maintaining social functioning and maintaining concentration, persistence, and pace.

Despite the lack of evidence of severe mental impairments during the time at issue, the ALJ, in consideration of those mental impairments, limited her to unskilled work within a low stress environment with no production-line type or pace or independent decision-making responsibilities;

involving only routine, repetitive instructions and tasks, with no interaction with the general public and no more than occasional interaction with supervisors and coworkers.

Based on the above, the undersigned finds that substantial evidence supports the ALJ's determination regarding Plaintiff's depression during the relevant time frame.

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

Here, despite the above determinations regarding Plaintiff's actual arguments, the undersigned finds the ALJ's hypothetical to the VE was not "based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)). Even though the undersigned finds Plaintiff's reports of her symptoms to certain examiners, the SSA, and even to the ALJ at the hearing were not credible, there is no dispute that she, in fact, had the medically determinable impairment of interstitial cystitis. The ALJ found this impairment was severe. During the time at issue, even after her implant, Plaintiff reported to her treating physician needing to use the bathroom 10 times a day and 4 times at night. The physician and Plaintiff both referred to this as 50% improved. Notably, Plaintiff had not applied for DIB at that time. The fact that Plaintiff underwent at least the two procedures and reported her improvement to her treating physician at a time she was not, at least according to the record, seeking benefits, supports the credibility of those reports. No one, including the ALJ or Plaintiff's counsel, inquired of the VE whether an individual

needing to use the bathroom 10 times a day and 4 times at night would be able to get and maintain work. The undersigned does not even know the frequency and urgency of the need– that is, whether Plaintiff would have required frequent, unscheduled breaks during the workday, and, if so, could these be accommodated by any jobs.

The only question the ALJ asked the VE regarding this issue was: "And, under the ADA, would an employer be able to accommodate a person by placing them relatively close to a bathroom?" to which the VE replied "that wouldn't be a problem under that [the ADA]. That is considered okay." The only limitation regarding this symptom in the RFC was that the employer must "accommodate the employee by placing her close to the bathroom."

The ALJ asked no hypothetical regarding frequency. Plaintiff's counsel, on the other hand, asked only if there would be jobs if Plaintiff needed to use the bathroom four to five times an hour, to which the VE responded there would not. Clearly, this frequency was not supported by the evidence during the time at issue. The failure of the ALJ to determine a frequency and duration during work hours is compounded by the clear fact that neither the ALJ nor Plaintiff's own counsel directed their questions to Plaintiff's symptoms during the relevant time period. All questions concerned Plaintiff's present symptoms, more than two years after her date last insured.

The undersigned could find only two cases, both from outside the Fourth Circuit, and both unreported, which addressed this issue, and both remanded the claim for further proceedings. In Green v. Astrue, 2010 WL 2901765 (E.D. Tenn), a very recent case, the ALJ had determined only that the claimant would require "frequent restroom breaks," but would still be able to perform her past work as a housekeeper. Plaintiff argued: "At no time does the ALJ make specific findings concerning the frequency of those restroom breaks or how long such anticipated breaks are expected

to last." The Commissioner countered that the finding that Plaintiff "must be allowed frequent restroom breaks" was reasonable "given the dearth of evidence" that Plaintiff's urinary problems caused her any serious functional limitations. The court found as follows:

> The Court agrees with Plaintiff that the ALJ's statement of the limiting effects of her incontinence was so imprecise that it was practically useless. The ALJ found that Plaintiff's urinary incontinence was a severe impairment, that limited her work-related functionality because it caused her to need "frequent restroom breaks." The ALJ provided no explanation of how often or for how long Plaintiff needed to visit the restroom over the course of a workday. These facts were clearly important to the ALJ's subsequent determination of whether Plaintiff's need for restroom breaks precluded her from performing certain jobs. If Plaintiff requires two restroom breaks of ten minutes every hour, there may be no jobs that she can perform. But if Plaintiff requires only one restroom break of five minutes every hour, perhaps she could perform some jobs. The Court is careful to note that it is only speculating to make the point that how often and for how long Plaintiff needs to use the restroom are important facts that should have been found by the ALJ . . . .

> Accordingly, the Court finds that the ALJ's failure to specify precisely how Plaintiff's need for frequent restroom breaks impacted her ability to work was an error that requires remanding this case. The ALJ's statement that Plaintiff "must be allowed frequent restroom breaks," simply does not convey the degree to which Plaintiff's ability to work was limited.

Id. at*5 (attached).

The court in Green specifically cited another unreported case, Brueggen v. Barnhart, 2006 WL 5999614 (W.D.Wis.)(attached). In Brueggen, a consulting physician testified that the only work-related limitation imposed by the claimant's conditions would be the need to have access to a bathroom. The ALJ asked the VE the following question: "In competitive work what is the frequency of access to the restrooms that is generally tolerated?" The VE responded that for unskilled work, bathroom breaks would typically be confined to the "normal" morning and afternoon break periods and the lunch break,[5] or three times in an 8-hour workday (or even a 9-hour workday

---

[5]Plaintiff in the present case was limited by the ALJ to unskilled work.

if lunchtime was not included as part of the employees' workday). In that case, as in the case before this Court, the claimant was found to be not credible regarding the number of times she needed to use the restroom; however, in Brueggen, the court found valid the claimant's point that "the ALJ could not just jump from her conclusion that Plaintiff's complaints were not entirely credible to her finding that plaintiff could return to her past relevant work without explaining how she reconciled Plaintiff's need to use the bathroom at will with the VE's testimony concerning the degree to which such bathroom use is generally tolerated by employers."

In this case, the ALJ did not include any frequency or duration of restroom breaks in his hypothetical. He asked only if the employer could accommodate her by placing her close to the bathroom. The VE in Brueggen testified an employee in an unskilled job would be allowed only three restroom breaks in an 8-hour workday. Although the undersigned does not adopt this testimony by a VE in another Circuit, he cannot find substantial evidence supports the ALJ's hypothetical to the VE or his reliance on the VE's testimony in response.

The undersigned therefore recommends this matter be remanded to the Commissioner solely for a determination of the actual, credible work-day limitations caused by Plaintiff's urinary frequency during the relevant time period, and whether those limitations would have precluded her from performing work available in significant numbers in the national economy.

Plaintiff then notes that the VE testified there would be 100-900 jobs as a photograph machine operator available to Plaintiff. Plaintiff argues, however, that "the increase in technology has undoubtedly decreased the number of photographic machine operator jobs," and that "the VE's notecards, from which he reviewed and testified, appeared to be extremely worn, even dirty, as if they had been in his possession for 20 years!" (Plaintiff's brief at 7-8)(Exclamation point in

original).

First, the undersigned notes that the photographic machine operator job was not the sole job named by the VE. He also identified the jobs of assembler of printed products and inserting machine operator. Second, the VE testified that nothing in his testimony was inconsistent with the DOT, with the exception of the sit/stand option, which is not addressed in the DOT. Third, counsel specifically inquired of the VE how often he updated his job stats, and the VE testified under oath that he tried to keep it up to a couple months, so he had reviewed the stats "within the last two months" (R. 47).

The undersigned finds these arguments have no merit.

### E. Interstitial Cystitis

Plaintiff next argues the Commissioner erred as a matter of law by failing to give appropriate weight to the interstitial cystitis diagnosis. Defendant contends the ALJ properly evaluated Plaintiff's interstitial cystitis. Plaintiff represents that SSR 02-2p "recognizes that this condition is a disability in and of itself." This is an incorrect interpretation of the Ruling, which states merely that IC "is a medically determinable impairment that <u>can</u> be the basis for a finding of 'disability,'" (emphasis added), and that IC that is severe "may" medically equal a listing.

The Ruling does direct the Commissioner to consider the individual with IC's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," and defines "regular and continuing basis" as 8 hours a day, five days a week, or an equivalent work schedule. The Ruling also notes: "In cases involving IC, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving urinary frequency." The undersigned notes that during the relevant time period, Plaintiff's treating physician reported Plaintiff needed to void 4 times per night.

32

For this additional reason the undersigned cannot find the ALJ's RFC or hypothetical to the VE are supported by substantial evidence.

## VI.  Conclusion

For all the above reasons, I find substantial evidence does not support the ALJ's determination that Plaintiff was not disabled through March 31, 2007.  This is partly based on the failure of either the ALJ or counsel to ask Plaintiff questions regarding her symptoms at the relevant time, but is also based on the ALJ's failure to inquire of the VE how often an employee would be permitted to use the restroom during a regular workday, even if it were nearby.  The undersigned recommends this claim be reversed and remanded to the Commissioner solely so a finding can be made concerning the frequency and duration of Plaintiff's necessary restroom usage during a normal workday on or before her date last insured, and to determine whether, in light of that finding, Plaintiff would have been able to work at a job(s) available in significant numbers in the national economy at that time.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for DIB is not supported by substantial evidence, and I accordingly respectfully recommend Defendant's Motion for Summary Judgment [Docket Entry 15] be **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition; and that his case be Dismissed and stricken from the docket of this Court.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

DATED: January **//**, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Tennessee.

Jimmie D. GREEN, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

**No. 3:09-CV-331.**

July 2, 2010.

West KeySummary

**Social Security and Public Welfare 356A ⚷142.10**

356A Social Security and Public Welfare

    356AII Federal Insurance Benefits in General

        356AII(C) Procedure

            356AII(C)1 Proceedings in General

                356Ak142.10 k. Findings and Conclusions. Most Cited Cases

In determining Disability Insurance Benefits (DIB) claimant's residual functional capacity (RFC), ALJ erred in failing to make a specific finding concerning the frequency and duration of claimant's bathroom usage. ALJ found that claimant's urinary incontinence was a severe impairment that required "frequent restroom breaks". However, the finding was indefinite as ALJ provided no explanation nor made any findings regarding how often or for how long claimant would need to visit the restroom of the course of a workday. 20 C.F.R. §§ 404.1520, 416.945(a)(1).

Dale L, Buchanan, Dale L. Buchanan & Associates, Chattanooga, TN, for Plaintiff.

Loretta S. Harber, U.S. Department of Justice, Office of U.S. Attorney, Knoxville, TN, for Defendant.

***REPORT AND RECOMMENDATION***

C. CLIFFORD SHIRLEY, JR., United States Magistrate Judge.

**\*1** This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation regarding disposition by the District Court of Plaintiff's Motion for Judgment on the Pleadings [Doc. 9] and Defendant's Motion for Summary Judgment [Doc. 17]. Plaintiff Jimmie D. Green ("Plaintiff") seeks judicial review of the decision of Administrative Law Judge ("ALJ") George L. Evans, III, denying him benefits, which was the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("the Commissioner").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

On July 15, 2004, Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). [Tr. 13]. On both applications, Plaintiff alleged a period of disability which began on May 20, 2003. [Tr. 13]. After her applications were denied initially and also denied upon reconsideration, Plaintiff requested a hearing. On May 22, 2007, a hearing was held before ALJ George L. Evans, III, to review the determination of Plaintiff's claim. [Tr. 226-50]. On June 14, 2007, the ALJ found that Plaintiff was not under a disability from May 20, 2003, through the date of the decision. [Tr. 13-19]. On June 2, 2009, the Appeals Council denied Plaintiff's request for review; thus, the decision of the ALJ became the final decision of the Commissioner. [Tr. 4-6]. Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**I. ALJ FINDINGS**

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2. The claimant has not engaged in substantial gainful activity since May 20, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: status-post uterine prolapse requiring hysterectomy and uterine prolapse repair surgery, urinary incontinence, mild degenerative changes in the lumbar spine, headaches, complaints of leg pain, and complaints of stomach pain (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 20 pounds occasionally or 10 pounds frequently and sit, stand, or walk for about 6 hours each out of an 8 hour day. The claimant cannot perform more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. She must be allowed frequent restroom breaks.

6. The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

**\*2** 7. The claimant has not been under a disability, as defined in the Social Security Act, from May 20, 2003, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

[Tr. 15-19].

**II. DISABILITY ELIGIBILITY**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

An individual is eligible for DIB if he is insured for DIB, has not attained retirement age, has filed an application for DIB, and is under a disability. 42 U.S.C. § 423(a)(1). An individual is eligible for SSI if he has financial need and he is aged, blind, or under a disability. See 42 U.S.C. § 1382(a). "Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). An individual shall be determined to be under a disability only if his physical and/or mental impairments are of such severity that he is not only unable to do his previous work, but also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Whether a DIB or SSI claimant is under a disability is evaluated by the Commissioner pursuant to a sequential five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir.1997) (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

A claimant bears the burden of proof at the first four steps. Id. The burden of proof shifts to the Commissioner at step five. Id. At step five, the Commissioner must prove that there is work available in the national economy that the claimant could perform. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir.1999) (citing Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)).

**III. STANDARD OF REVIEW**

*3 When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir.2009) (citing Key v. Callahan, 109 F.3d 270,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

273 (6th Cir.1997)). If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir.2004); 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir.2007); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consol. Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.,* 790 F.2d 450, 453 n. 4 (6th Cir.1986). The substantial evidence standard is intended to create a " 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) (quoting *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters,* 127 F.3d at 528.

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings [FN1] promulgated by the Commissioner. *See Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); *id.* at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.' ") (quoting 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers,* 486 F.3d at 243

(holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record"). "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," and the Court therefore "cannot excuse the denial of a mandatory procedural protection ... simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination. *Wilson,* 378 F.3d at 545-46. The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

> FN1. *See Blakley,* 581 F.3d at 406 n. 1 ("Although Social Security Rulings do not have the same force and effect as statutes or regulations, '[t]hey are binding on all components of the Social Security Administration' and 'represent precedent final opinions and orders and statements of policy' upon which we rely in adjudicating cases.") (quoting 20 C.F.R. § 402.35(b)).

\*4 An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ's] procedural lapses." *Wilson,* 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. *See id.* at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error). If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination. *Blakley,* 581 F.3d at 409 (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

decision, requires that a reviewing court "reverse and remand unless the error is a harmless *de minimis* procedural violation").

On review, Plaintiff bears the burden of proving her entitlement to benefits. *Boyes v. Sec'y of Health & Human Servs.,* 46 F.3d 510, 512 (6th Cir.1994) (citing *Halsey v. Richardson,* 441 F.2d 1230 (6th Cir.1971)).

**IV. ANALYSIS**

Plaintiff raises three allegations of error on appeal:

(A) The ALJ erred by failing to adequately specify his finding that Plaintiff required "frequent restroom breaks," [Doc. 10 at 5] (quoting [Tr. 16] );

(B) The ALJ erred by failing to obtain the testimony of a vocational expert regarding how Plaintiff's need for frequent restroom breaks affected her ability to work, [Doc. 10 at 8-10]; and

(C) The ALJ improperly evaluated Plaintiff's credibility, [Doc. 10 at 10-15].

Plaintiff asserts that these three errors led the ALJ to determine that she was capable of performing her past relevant work as a housekeeper. Plaintiff contends that this determination was incorrect and unsupported by the record. She argues that this case should be remanded to the Commissioner so that he can consider additional evidence regarding how her need for frequent restroom breaks "affect[s] her ability to sustain full-time work."

[Doc. 10 at 16]. Plaintiff also argues that remand is necessary so that the Commissioner can properly evaluate her credibility. [Doc. 10 at 16].

The Court addresses Plaintiff's allegations of error, and the Commissioner's response to each, in turn.

**A. The ALJ's finding that Plaintiff required "frequent restroom breaks" was insufficient.**

Plaintiff contends that "[t]he scope of the ALJ's finding regarding [her] need for 'frequent restroom breaks' is vague and ambiguous." [Doc. 10 at 5] (quoting [Tr. 16] ). Plaintiff asserts that the ALJ failed to make "specific findings inherent to" a need for frequent restroom breaks. [Doc. 10 at 5]; [Doc. 10 at 7] ("At no time does the ALJ make specific findings concerning the frequency of those restroom breaks or how long such anticipated breaks are expected to last."). Plaintiff argues that this failure made it impossible for the ALJ to properly determine whether her incontinence "preclude[d] her from performing her past employment." [Doc. 10 at 7]. Accordingly, Plaintiff concludes that this case should be remanded for further proceedings to reach a more precise and useful statement of the limiting effects of her incontinence. [Doc. 10 at 7, 16].

**\*5** In response, the Commissioner simply contends that the ALJ's finding that Plaintiff "must be allowed frequent restroom breaks," [Tr. 16], was reasonable "given the dearth of evidence" that Plaintiff's urinary incontinence caused her any serious functional limitations. [Doc. 18 at 13]. The Commissioner asserts that Plaintiff did not undergo any treatment or care for incontinence following her January 2003 surgery. [Doc. 18 at 12]. The Commissioner also points out that although Plaintiff "thoroughly discussed her various medical problems and made a list of at least four medical concerns" with her most recent treating physician, Dr. Staci Stalcup, M.D.,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"urinary frequency or <u>urinary incontinence</u> did not make the list." [Doc. 18 at 13] (citing [Tr. 197-98] ).

The Court finds that the Commissioner's response is a non sequitur. Plaintiff essentially argues that the ALJ's statement of her residual functional capacity ("RFC") was so indefinite that it could not be usefully relied upon at the next step of the disability determination process, i.e. making a finding about whether Plaintiff's RFC allowed her to perform her past relevant work. *See Walters, 127 F.3d at 529 (6th Cir.1997); 20 C.F.R. § 404.1520.* To respond by attempting to explain *why* the ALJ's statement of Plaintiff's RFC was indefinite is to miss the point.<u>FN2</u> If, as the Commissioner asserts, the ALJ was not convinced that Plaintiff's incontinence seriously impacted her ability to work, then he should have stated as much in his RFC conclusion.

> <u>FN2.</u> The Commissioner does not argue that the ALJ's finding that Plaintiff "must be allowed frequent restroom breaks" is in fact a definite, useful statement of one of Plaintiff's work-related limitations.

The Court agrees with Plaintiff that the ALJ's statement of the limiting effects of her incontinence was so imprecise that it was practically useless. The ALJ found that Plaintiff's <u>urinary incontinence</u> was a severe impairment, [Tr. 15], that limited her work-related functionality because it caused her to need "frequent restroom breaks," [Tr. 16]. The ALJ provided no explanation of how often or for how long Plaintiff needed to visit the restroom over the course of a workday. These facts were clearly important to the ALJ's subsequent determination of whether Plaintiff's need for restroom breaks precluded her from performing certain jobs. If Plaintiff requires two restroom breaks of ten minutes every hour, there may be no jobs that she can perform. But if Plaintiff requires only one restroom break of five minutes every hour, perhaps she could perform some jobs. The Court is careful to note

that it is only speculating to make the point that how often and for how long Plaintiff needs to use the restroom are important facts that should have been found by the ALJ.

At least one court has expressly recognized that when a social security claimant has an impairment that requires her to have "ready access to a bathroom" and the freedom to use it "as needed," an ALJ should "make a specific finding concerning the frequency and duration of [the claimant]'s bathroom usage" as part of the statement of the claimant's RFC. *Brueggen v. Comm'r of Soc. Sec.,* 2006 U.S. Dist. LEXIS 92291, at *6 (W.D.Wis.2006). This specific finding is necessary so that the RFC statement can be relied upon when determining at the next step of the disability determination process if the claimant can perform her past relevant work. *See id.* (stating that whether a claimant is able to work should be determined "in light of" the specific finding about the frequency and duration of her required bathroom breaks); 20 C.F.R. § 416.945(a)(1) (a claimant's RFC is defined as "the most [the claimant] can still do despite [her] limitations").

*6 Accordingly, the Court finds that the ALJ's failure to specify precisely how Plaintiff's need for frequent restroom breaks impacted her ability to work was an error that requires remanding this case. The ALJ's statement that Plaintiff "must be allowed frequent restroom breaks," [Tr. 16], simply does not convey the degree to which Plaintiff's ability to work was limited.

**B. The ALJ's failure to obtain vocational expert testimony cannot be characterized as error.**

Plaintiff contends that "[t]he ALJ erred by failing to obtain testimony of a vocational expert in regard to: (a) the number of breaks that a typical employer will generally allow; (b) whether the need for 'frequent restroom breaks' would require [Plaintiff] to exceed normal work tolerances; [and] (c) whether the need for 'frequent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

restroom breaks' would preclude [Plaintiff] from performing her past work as a housekeeper." [Doc. 10 at 8]. Plaintiff argues that because the ALJ did not hear from a vocational expert, he did not have substantial evidence on which to base his finding that "[n]othing in the housekeeper job description would prevent the claimant from having restroom breaks as needed," [Tr. 18]. Plaintiff argues that the ALJ could not properly make this finding without (1) having previously made specific findings concerning the frequency and duration of needed bathroom breaks, and (2) hearing evidence about the degree to which bathroom breaks at a specified frequency for a specified duration interfere with a job as a housekeeper.

In response, the Commissioner simply asserts that "there is no requirement that vocational expert testimony be used at step four[, i.e., determining whether a claimant's RFC allows her to perform her past relevant work]." [Doc. 18 at 11] (citing Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process, 68 Fed.Reg. 51153, 51160 (Aug. 26, 2003) (response to public comments) ("VE testimony is not required at step 4, but VE evidence may be obtained at step 4 to help us determine whether or not an individual can do his or her past relevant work")).

The Court finds that the Commissioner has correctly stated the law. Accordingly, the ALJ's failure to obtain vocational expert testimony cannot be characterized as *per se* error. When determining whether a claimant's RFC allows him to perform his past relevant work, an ALJ may obtain evidence about the requirements of that work from many sources. The ALJ may ask the claimant about the requirements of his previous job, and he may "ask other people who know about [the claimant's] work." 20 C.F.R. §§ 404.1560(b)(2); 416.960(b)(2). The ALJ also "may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence [he] need[s] to help [him] determine whether [the

claimant] can do [his] past relevant work, given [his] residual functional capacity." *Id.* Importantly, however, an ALJ is not *required* to obtain vocational expert testimony. Clarification of Use of Vocational Experts, 68 Fed.Reg. at 51160.

**\*7** In this case, the Court agrees with Plaintiff that a "vocational expert could have testified to the typical duties specific to a housekeeper position and whether [Plaintiff]'s need for 'frequent restroom breaks'-a non-exertional limitation-would have prevented her from returning to her past work." [Doc. 10 at 9]. But the ALJ's failure to obtain vocational expert testimony is not reversible error. As stated above, an ALJ may rely on other evidence of what a job requires. In this case, the ALJ found that Plaintiff had the RFC to perform her past relevant work as a housekeeper. [Tr. 18]. To determine the requirements of Plaintiff's job as a housekeeper, the ALJ appropriately relied upon the Dictionary of Occupational Titles ("DOT"). *See* 20 C.F.R. §§ 404.1560(b)(2); 416.960(b)(2) (stating that the DOT is an appropriate resource). The ALJ stated that "[a]ccording to the Dictionary of Occupational Titles ... [Plaintiff]'s past work as a housekeeper consisted of light exertion, semi-skilled work." [Tr. 18]. Although the ALJ did not provide a pinpoint citation to the DOT to support his statement, the Court finds that the statement was reasonable and supported by substantial evidence in the record. [FN3] At her hearing, Plaintiff described her housekeeping work as "cleaning cabins." [Tr. 234]. On her Work History Report [Tr. 91-94], Plaintiff stated that she had worked as a "maid" at Highland Motor Inn and Eagle Ridge cabins. Plaintiff's July 11, 2005 Vocational Assessment [Tr. 128] states that she has experience as a "cleaner, housekeeping (any)," and describes this employment as falling within definition 323.687-014 in the DOT. Accordingly, the ALJ's decision to rely on the DOT for evidence of the requirements of Plaintiff's past employment as a housekeeper was reasonable and supported by substantial evidence.

FN3. Plaintiff weakly argues that the ALJ's decision regarding what her past relevant work

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

required was "ambiguous at best." [Doc. 10 at 10]. Plaintiff argues as follows:

> While there is no pinpoint citation to the DOT in regard to this finding, there is also no housekeeper or cleaning position within the DOT which requires "light exertion, semi-skilled work." While it is more likely than not that the ALJ relied on the Vocational Assessment-classifying Ms. Green's work as a "Cleaner, Housekeeping (any)," which is unskilled and requires light work, [Tr. 128-29]-and then made a harmless error when drafting the decision, without a direct citation to the DOT or Vocational Assessment, the ALJ's decision is ambiguous at best. Moreover, the ALJ's decision classifies Ms. Green's past work as DOT 323.687-014, which refers to a cleaner and/or housekeeper in "any industry." [Tr. 128-29]. Had a vocational expert been present at the hearing and testified to such, an opportunity for cross-examination to determine why this classification was chosen-as opposed to housecleaner (hotel & rest.), DOT 323.687-018, which accurately pinpoints the locations and reflects the physical exertion described by Ms. Green in her work history report. [Tr. 91-98].

[Doc. 10 at 9-10].

The Court finds this argument to be frivolous. The relevant issue in this case is whether Plaintiff's need for restroom breaks precludes her from performing her past relevant work. Plaintiff has not explained how an employer's tolerance for frequent restroom breaks differs based on whether an employee is performing a job that fits within DOT definition 323.687-014 or one that fits within DOT

definition 323.687-018. Plaintiff has not challenged the ALJ's statement of her exertional limitations or her occupational skill level. Accordingly, whether DOT definition 323.687-014 or 323.687-018 better describes the exertional and skill requirements of Plaintiff's past employment is inapposite.

Although the ALJ's failure to obtain vocational expert testimony was not error *per se,* the Court finds that his failure to discuss *any* evidence regarding how a need for frequent restroom breaks would impact an individual's ability to perform a housekeeper job requires remanding this case. Nothing in the record or the DOT indicates that an individual is able to perform a housekeeper job no matter how frequently and for how long she needs bathroom breaks. In fact, nothing in the record or DOT provides any information about employer tolerance for breaks of any kind from housekeeping work. It was therefore improper for the ALJ to simply state that "[n]othing in the housekeeper job description would prevent the claimant from having restroom breaks as needed," [Tr. 18]. The ALJ did not explain his reasoning at all, and he pointed to no evidence that housekeepers are free to use the restroom "as needed." The Court therefore finds that the ALJ's conclusion was not supported by substantial evidence.

**C. On remand, the ALJ must explain whether he found Plaintiff's statements and self-reports concerning the severity and functionally limiting effects of her <u>urinary incontinence</u> to be credible.**

**\*8** Plaintiff contends that the ALJ improperly evaluated her credibility. [Doc. 10 at 10-15]. The ALJ stated as follows: "The claimant's overall credibility is eroded by her repeated claims to treating and examining physicians in the record that she had a lumbar disc fusion surgery. The medical evidence of record does not substantiate this claim." [Tr. 18]. The Court finds that it is not clear from the ALJ's statement whether he discounted the credibility

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

(Cite as: 2010 WL 2901765 (E.D.Tenn.))

of *all* of Plaintiff's statements and self-reports in the record, or just those statements and self-reports concerning her back problems. The Court has already recommended, *supra,* that this case be remanded to the ALJ for a proper determination of (1) the precise limitations caused by Plaintiff's urinary incontinence, and (2) whether those limitations preclude Plaintiff from performing her past relevant work. When determining the precise limitations caused by Plaintiff's incontinence on remand, the ALJ must properly explain his consideration of Plaintiff's statements and self-reports, and whether he finds them to be credible.

## V. CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED**[FN4] the Commissioner's Motion for Summary Judgment **[Doc. 17]** be **DENIED,** and that Plaintiff's Motion For Judgment on the Pleadings **[Doc. 9]** be **GRANTED** to the extent that it requests that this case be remanded to the Commissioner pursuant to 42 U.S.C. § 1383(c)(3) and sentence four of 42 U.S.C. § 405(g) for a new hearing consistent with this report.

FN4. Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall,* 806 F.2d 636 (6th Cir.1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of*

*Teachers,* 829 F.2d 1370 (6th Cir.1987).

E.D.Tenn.,2010.

Green v. Astrue

Slip Copy, 2010 WL 2901765 (E.D.Tenn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

W.D. Wisconsin.

Dorothy **BRUEGGEN**, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

**No. 06-C-0154-C.**

Dec. 15, 2006.

Richard D. Humphrey, Assistant U.S. Attorney, Madison, WI, for Defendant.

REPORT AND RECOMMENDATION

STEPHEN L. CROCKER, United States Magistrate Judge.

REPORT

**\*1** This is a social security appeal brought pursuant to 42 U.S.C. § 405(g). Plaintiff Dorothy Brueggen is a 58-year old former medical claims examiner who suffers from irritable bowel syndrome. According to plaintiff, her condition causes her to have frequent, explosive and unpredictable bouts of diarrhea that preclude her from maintaining competitive employment. The administrative law judge who considered plaintiff's application for disability insurance benefits determined that plaintiff's symptoms would not prevent her from working so long as she has ready access to a bathroom and the freedom to use the bathroom when needed. The issue in this case is whether substantial evidence supports the ALJ's conclusion that plaintiff's bathroom needs could be accommodated by her former employment.

As discussed below, although the ALJ wrote a careful and cogent decision, there is one apparent gap that would seem to require remand. Accordingly, in spite of what is an otherwise through and well-reasoned decision by the ALJ, I am recommending that this court reverse the decision of the commissioner and remand it for further proceedings.

The following facts are drawn from the administrative record:

FACTS

In July 2003, plaintiff Dorothy Brueggen filed an application for disability insurance benefits, alleging that she had unable to work since March 2003 because of abdominal pain, chronic diarrhea and nausea. Plaintiff attributed her symptoms to non-alcoholic cirrhosis of the liver, with which she had been diagnosed in January 2003 following surgery to remove her gallbladder.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

In March 2004, plaintiff began seeing Dr. Kevin McClelland, a gastroenterologist, for complaints of diarrhea. Plaintiff reported that her symptoms, which consisted of sudden onsets of bowel movements associated with some midepigastric discomfort and nausea, began around the time she had her gallbladder removed in January 2003. A thorough workup, including an upper endoscopy, colonoscopy, biopsies and laboratory testing, revealed no significant abnormalities, leading Dr. McClelland to diagnose plaintiff with irritable bowel syndrome.[FN1] Although plaintiff's nausea and abdominal pain improved on proton pump inhibitor therapy, various medications prescribed by Dr. McClelland failed to alleviate the diarrhea. In August 2004, Dr. McClelland determined that it would be worthwhile to refer plaintiff for a second opinion, noting plaintiff's "ongoing symptoms and significant debility that they provide by her description." AR 352.

FN1. Unlike inflammatory bowel disease, irritable bowel syndrome does not cause inflammation or changes in bowel tissue, and its symptoms usually are mild. (This information can be found by searching for the term "irritable bowel syndrome" at *www.mayoclinic.com.*)

In September 2004, plaintiff saw Dr. Waldo Avello, who ordered more testing to determine the cause of plaintiff's diarrhea. Dr. Avello noted that plaintiff's diarrhea was probably not secretory in nature, noting that the number of plaintiff's bowel movements appeared to decline when plaintiff abstained from food. AR 380. Apparently, Dr. Avello ultimately agreed with the diagnosis of irritable bowel syndrome.

At an administrative hearing held on November 4, 2004, Dr. Andrew Steiner, a consulting physician, testified that

plaintiff's impairments consisted of undiagnosed diarrhea and cirrhosis with associated fatty changes in the liver. Reviewing the listings for gastrointestinal disorders and liver disease, Dr. Steiner concluded that neither condition was severe enough to be presumptively disabling. With respect to the cirrhosis, Dr. Steiner indicated that there was no evidence of jaundice or abnormal liver functions to suggest liver failure. He testified that the only work-related limitation imposed by plaintiff's condition would be the need to have access to a bathroom.

*2 Plaintiff testified at the hearing that she could not work because of constant diarrhea that beset her without warning, constant stomach pain that fluctuated in intensity, and constant nausea. Plaintiff testified that she experienced between 7 and 25 episodes of diarrhea in a 24-hour period and that she wore a protective pad. As for the nausea, plaintiff said she sometimes could not stay on the phone because she felt like she was going to vomit and that she typically had to lie down twice a day for 15-20 minutes. Plaintiff said she ate small meals for the nausea and had lost 35 pounds. According to plaintiff, she was unable to do her job as a medical claims examiner because of the diarrhea. Plaintiff testified that she was running to the bathroom so often that her employer had to hire another individual to help her do her job.

The ALJ called vocational expert Edward Utities to testify. The ALJ asked Utities the following question:

[I]n competitive work what is the frequency of access to the restrooms that is generally tolerated?

The VE testified that employer tolerance for bathroom breaks depended upon the type of work that was being performed: for unskilled work, bathroom breaks would typically be confined to the "normal" morning and afternoon break periods and the lunch break; professional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

or office work would be more flexible and would probably allow for an additional break or two of 5-10 minutes in duration. However, said the VE, most employers would not tolerate unscheduled breaks exceeding 10 minutes beyond those allowed by three typical break periods. The VE testified that if plaintiff required up to seven bathroom breaks a day, as she had testified, then she "probably" would not be able to perform even skilled office work. The VE elaborated:

> There are ways of dealing with that using pads for that matter and things of that nature but, again, if a person absolutely had to use bathroom facilities a lot would be depending in terms of what they are doing. For example, if they are on a phone call and they absolutely had to leave. That would be something that would be a real negative factor, or if they were dealing with a customer in person. That would not be so good on a consistent basis.

AR 406.

After the hearing, the ALJ wrote to Dr. McClelland and posed a series of questions concerning plaintiff's condition. One of the ALJ's questions was whether there was an objective medical basis for plaintiff's complaints of ongoing, uncontrolled diarrhea 7 to 25 times a day and unremitting abdominal pain. Dr. McClelland responded that after other impairments had been ruled out, plaintiff had been diagnosed with irritable bowel syndrome unresponsive to therapy. In response to a different question, Dr. McClelland indicated that plaintiff's diarrhea had not resulted in any complications, such as weight loss, dehydration or abnormal laboratory findings; however, he indicated that diarrhea of the duration and frequency described would not ordinarily result in such complications. AR 381.

**\*3** At a supplemental hearing on April 15, 2005, plaintiff presented testimony from witnesses who worked with her

before she left her job as a claims examiner. Lori Neidenmire testified that she saw plaintiff go to the bathroom at least hourly, and sometimes more often, and that she was aware of times that plaintiff had to leave work either because she had soiled herself or because she was in the bathroom more than she was working. However, Neidenmire testified that plaintiff was a very good employee and a "good producer." Neidenmire was not aware of any concerns by management that plaintiff was not satisfactorily performing her work as a claims examiner. Another co-employee, Christine Adkinson, testified that plaintiff took unscheduled bathroom breaks for up to 30 minutes at least a couple times an hour.

The ALJ recalled Dr. Steiner to testify.<u>FN2</u> Dr. Steiner testified that he disagreed with Dr. McClelland's statement that diarrhea of the nature and frequency described by plaintiff would not lead to some weight loss or <u>electrolyte imbalances</u>, indicating that persistent, <u>chronic diarrhea</u> generally leads to such secondary problems. Dr. Steiner indicated that in addition to wearing protective pads, a person could control diarrhea by avoiding caffeinated beverages and raw fruits and vegetables. Dr. Steiner also testified that timing of eating could be used to control diarrhea, explaining that after eating there was a reflex that caused stimulation of the rectal muscle. Dr. Steiner testified, however, that <u>irritable bowel</u> syndrome was a condition that could cause a person to use the bathroom at unscheduled times and for variable lengths of time.

> <u>FN2.</u> A vocational expert also testified at the second hearing, offering the unremarkable conclusion that no competitive employment was available to a person who had to take unscheduled breaks up to two times per hour for as long as 30 minutes each.

On July 7, 2005, the ALJ issued a written decision finding plaintiff not disabled. Applying the familiar sequential evaluation process for evaluating disability claims, *see* 20

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

C.F.R. § 404.1520, the ALJ found that plaintiff had not engaged in substantial gainful employment since her alleged onset date (step 1); plaintiff had a severe impairment, irritable bowel syndrome (step 2); plaintiff's impairment was not severe enough to meet or equal the criteria of an impairment deemed presumptively disabling (a.k.a a "listed impairment") (step 3); and plaintiff was able to perform her past relevant work as a claims clerk/medical claims examiner (step 4). At step two, the ALJ acknowledged that plaintiff had cirrhosis with mild abnormalities in liver functioning, obesity and mild sensory neuropathy. However, the ALJ found that because plaintiff was not significantly limited by any of these conditions, plaintiff's cirrhosis was not a severe impairment.

In reaching her determination that plaintiff could return to her past relevant work, the ALJ found that plaintiff's only work-related limitations were the need to have ready access to a bathroom and to have bathroom breaks, as needed, and that insofar as plaintiff alleged total disability, her complaints were not credible. As support for her credibility determination, the ALJ relied on the lack of objective medical evidence as well as several other pieces of evidence, including evidence indicating that plaintiff's stomach pain and nausea had improved with medication; the lack of evidence that plaintiff had made significant attempts to manage her diet or time of meals or use prescribed pads; plaintiff's activities of daily living; and plaintiff's work history. With respect to plaintiff's work history, the ALJ pointed out that plaintiff had indicated on a questionnaire that one of the reasons her last job had ended was because she had moved; the ALJ found that "[t]he fact that the claimant ceased working for reasons unrelated to the impairment does not add credibility to an allegation that it is the disability that prevents work." AR 23.

*4 With respect to the testimony of plaintiff's former co-workers, the ALJ found that:

Collateral testimony presented during the hearing indicated that the claimant was observed to take unscheduled breaks at work and to go home occasionally because of an accident in which she would soil herself. The testimony about the frequency and length of time the claimant was gone from work was somewhat inconsistent and it was noted that the claimant was adequately performing her job. These allegations are not consistent with the medical record, the conclusions drawn would have been based on the claimant's allegations, and they are also not consistent with the claimant's course of treatment consisting primarily of the use of medication without significant diet modifications or other treatment recommendations.

AR 22.

In determining plaintiff's residual functional capacity, the ALJ gave significant weight to the opinion of Dr. Steiner, who, according to the ALJ, had expressed the opinion "that the claimant could perform work within the previously-described limitations." AR 23. Finding that the record "indicates that the claimant performed her past job with ready access to a bathroom and bathroom breaks, as needed," the ALJ found no evidence from which to conclude that plaintiff could not continue to perform such work. AR 24.

The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the commissioner.

ANALYSIS

I. Standard of Review

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

The standard by which a federal court reviews a final decision by the commissioner is well-settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), this court cannot reconsider facts, reweigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ regarding what the outcome should be. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000). Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner. *Edwards v. Sullivan,* 985 F.2d 334, 336 (7th Cir.1993). With respect to credibility determinations, this court will reverse only if the finding is "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir.2006) (citation omitted); *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir.2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying.").

2. Evaluation of Subjective Complaints

There is no dispute in this case that plaintiff suffers from bowel incontinence. The only issue in contention is whether substantial evidence supports the ALJ's determination that plaintiff still could perform her past work if she was allowed bathroom breaks "as needed." Plaintiff insists that she cannot. She argues that the phrase "as needed" does not account for the unpredictable and urgent nature of her bathroom visits. I disagree. In spite of plaintiff's repeated arguments to the contrary, the term "as needed" implies just that: that plaintiff must have the ability to use the bathroom whenever she needs it without being limited to the regularly-scheduled break periods. I am satisfied that in finding that plaintiff required bathroom

breaks "as needed," the ALJ properly understood that plaintiff's needs did not occur like clockwork.

**\*5** Even so, argues plaintiff, the record establishes that she cannot work competitively even with bathroom breaks as needed. Plaintiff points to her testimony that she needs to visit the restroom between 7 and 25 times daily and to the vocational expert's testimony at the first hearing that seven restroom breaks per day would preclude plaintiff from performing even the types of professional office work that she had performed in the past. However, plaintiff's argument assumes that the ALJ found plaintiff's testimony concerning the frequency of her bathroom visits to be credible, which is not the case. To the contrary, the ALJ stated that she did *not* "find [plaintiff's] statements suggesting an inability to perform all gainful activity to be fully credible."

Although it is true that the ALJ described plaintiff's subjective complaints in broad terms like "incapacitating limitations" and "an inability to perform all gainful activity," it is apparent from the ALJ's decision and the record that the ALJ was including plaintiff's allegation of having to use the bathroom at least seven times each workday among those complaints. The ALJ clearly was aware of plaintiff's testimony concerning frequency: she noted it in her questions to Dr. McClelland and at the outset of the supplemental hearing. Moreover, nothing in the ALJ's decision suggests that she ignored or misunderstood the VE's testimony that seven or more bathroom breaks each day would preclude competitive employment. Although the ALJ could have been more explicit, it is apparent that in finding plaintiff's allegations of "incapacitating limitations" not credible, the ALJ was including plaintiff's assertion that she would require at least 7 bathroom breaks per workday.

The ALJ found plaintiff's complaints of debilitating limitations not credible for these reasons: the lack of supporting objective medical evidence; the improvement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

of plaintiff's nausea and abdominal pain with the use of a proton pump inhibitor; the lack of medical treatment from June 2003 to March 2004; the lack of evidence to suggest that plaintiff attempted to manage her symptoms through diet, time of meals or use of prescribed pads; plaintiff's wide range of daily activities; and plaintiff leaving her past job because she moved to another state.

Plaintiff raises valid objections to some of these findings. For example, I agree that it was improper for the ALJ to criticize plaintiff for not attempting to control her diarrhea by altering her diet, timing her meals or using "prescribed" pads when there is no evidence that plaintiff's treating gastroenterologist, Dr. McClelland, recommended these approaches to the problem. I also question whether it was appropriate for the ALJ to adopt the opinion of Dr. Steiner, a physiatrist, over that of Dr. McClellan, a specialist in gastrointestinal disorders, concerning the likelihood that secondary problems would result from diarrhea of the severity reported by plaintiff. Finally, the various and rather extensive daily activities in which plaintiff engages say little about plaintiff's ability to be employed competitively because these activities occur primarily in her home where plaintiff has unrestrained access to a restroom.

*6 In spite of these concerns, the ALJ's credibility determination is not patently wrong. As the ALJ noted, there was sparse objective medical evidence to corroborate the claimed severity of plaintiff's symptoms. Even if plaintiff is correct that irritable bowel syndrome is akin to fibromyalgia and other disorders for which there are no objective tests, the ALJ was entitled to take the lack of objective medical evidence into account so long as she also considered the other factors the commissioner deems relevant to evaluating a claimant's subjective complaints, including plaintiff's course of treatment, efforts to alleviate symptoms including use of medications, daily activities and work history. Knight v. Chater, 55 F.3d 309, 314 (7th Cir.1995); 20 C.F.R. § 404.1529(c).

In addition to the lack of objective evidence, the ALJ noted plaintiff's lack of treatment from June 2003 to March 2004; the effectiveness of proton pump inhibitor therapy in reducing plaintiff's symptoms of abdominal pain and nausea; and plaintiff's having left her past job in part because she moved as factors undermining the credibility of plaintiff's complaints. In making her credibility determination, the ALJ cited accurately to the record and articulated clearly how she was weighing the evidence. Even after setting to one side the questionable findings noted above, I cannot conclude the ALJ erred in discounting plaintiff's testimony. Herron v. Shalala, 19 F.3d 329, 336 (7th Cir.1994) (court can affirm ALJ's credibility finding if some but not all reasons cited by ALJ are supported by record); Edwards v. Sullivan, 985 F.2d 334, 338 (7th Cir.1993) ("[D]eterminations of credibility often involve intangible and unarticulable elements which impress the ALJ, that, unfortunately leave no trace that can be discerned in this or any other transcript.")

Plaintiff maintains that even if the ALJ properly determined that plaintiff's allegations of disabling symptoms were not entirely credible, this determination does not answer the question whether plaintiff's symptoms preclude her from performing her past employment. According to plaintiff, to determine plaintiff's ability to return to her former employment, the ALJ was obliged to make a specific finding of how often and at what intervals plaintiff would have to use the bathroom. Absent such a finding, argues plaintiff, the ALJ's conclusion that plaintiff is capable of performing her past work is not supported by substantial evidence. Plaintiff also points out that contrary to the ALJ's finding, Dr. Steiner never testified that plaintiff could work so long as she had bathroom breaks as needed; rather, he testified only that the need to have proximity to a bathroom and to take unscheduled bathroom breaks was consistent with a diagnosis of irritable bowel syndrome.

There may be convincing counter-arguments to plaintiff's position, but the commissioner hasn't made them. For example, an argument could be made that because the

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

evidence indicated that plaintiff was able to perform her past job in spite of her frequent trips to the bathroom, it was not necessary for the ALJ to rely on the VE's findings or to make findings regarding precisely how often and for how long plaintiff would be away from her work station. *See* 20 C.F.R. § 404.1560 (to be found capable of performing past relevant work, a claimant must be able to perform her past work either as the job is generally performed in the national economy or as the claimant actually performed it). [FN3] In response to plaintiff's argument, the commissioner asserts only that

> FN3. Ordinarily this court does not entertain new arguments after the report and recommendation issues, but 28 U.S.C. § 636(b)(1) allows the district judge to amplify the record as she sees fit when providing her de novo ruling on plaintiff's summary judgment motion.

*7 [P]laintiff ... cites no authority for the proposition that an ALJ must question a claimant about every discrepancy that exists between her testimony and the record evidence. Moreover, Plaintiff offers no explanation why her attorney could not have questioned her about [the frequency of her bathroom needs] at the hearing.

Mem. in Supp. of Comm.'s Dec., dkt. # 16, at 20.

The commissioner's argument is a non sequitur. In response to questioning by the ALJ, plaintiff testified that she suffered from explosive, unpredictable bouts of diarrhea that required her to use the bathroom not less than seven times every day. What additional information might plaintiff's own attorney have adduced through additional questioning? It seems that the commissioner is suggesting that the plaintiff should have hedged her bets by proposing a lower fallback number in the event the ALJ disbelieved

her testimony regarding seven or more breaks per day. Since plaintiff's position is that she really does need at least seven restroom breaks each day, this wasn't an option.

Plaintiff's argument is that if the ALJ thought plaintiff was exaggerating the frequency of her bathroom usage, and if the ALJ had determined that "as needed" for plaintiff meant something less than seven restroom breaks per day, then the ALJ had to assign a numerical value to "as needed" in order properly to support her finding that plaintiff was not disabled by the frequency of her diarrhea. According to plaintiff, it was necessary for the ALJ to quantify how many breaks plaintiff actually needed because the VE testified that even in a professional setting, too many unscheduled breaks would preclude competitive employment.[FN4] The commissioner's response does not address this point.

> FN4. In her reply brief, plaintiff asserts that the VE at the first hearing testified that "unscheduled breaks would preclude [past relevant work] and other work in the national economy." Plt.'s Reply Mem., dkt. # 17, at 2. This is a misstatement of the VE's testimony. *See* AR 405-406.

Plaintiff makes a valid point when she argues that the ALJ could not just jump from her conclusion that plaintiff's complaints were not entirely credible to her finding that plaintiff could return to her past relevant work without explaining how she reconciled plaintiff's need to use the bathroom at will with the VE's testimony concerning the degree to which such bathroom use is generally tolerated by employers. The only evidence the ALJ cited was Dr. Steiner's testimony, but as plaintiff points out, Dr. Steiner never offered an opinion regarding how often plaintiff would need to use the bathroom or whether that use would preclude competitive employment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

(Cite as: 2006 WL 5999614 (W.D.Wis.))

Accordingly, I am recommending that this court remand the case to the commissioner so that she can make a specific finding concerning the frequency and duration of plaintiff's bathroom usage and determine whether, in light of those findings, plaintiff is able to work.

III. Plaintiff's Remaining Claims

Plaintiff's remaining arguments merit little discussion. Plaintiff contends the ALJ erred in failing to find that her cirrhosis [FN5] is a severe impairment. However, to be "severe," an impairment must "significantly limit" the claimant's ability to perform basic physical or mental work tasks. 20 C.F.R. § 404.1520(c). Apart from the diagnosis itself, plaintiff points to no evidence in the record to suggest that the condition imposed any significant limitations on her ability to work. Neither Dr. Steiner nor the two state agency consulting physicians who reviewed the record identified any non-exertional limitations resulting from plaintiff's cirrhosis. Substantial evidence supports the ALJ's conclusion that plaintiff's cirrhosis is not a severe impairment.

FN5. In her reply brief, plaintiff erroneously refers to this condition as "sclerosis."

*8 The medical literature that plaintiff has attached to her brief was not before the ALJ and therefore is beyond the scope of judicial review. Even so, that literature shows only that some people with cirrhosis may experience abdominal pain and nausea; it does not constitute substantial evidence to show that *plaintiff's* cirrhosis produces such symptoms. In any case, the ALJ considered plaintiff's complaints of abdominal pain and nausea and found that they were effectively controlled with medication. She committed no error with respect to her evaluation of plaintiff's cirrhosis.

Plaintiff also criticizes the ALJ for dismissing letters from Dr. McClelland and plaintiff's family physician, Dr. Lira, which indicated that plaintiff's symptoms of abdominal pain and chronic diarrhea were disabling. As the ALJ noted, however, both doctors' statements were based upon plaintiff's own allegations concerning the severity of her symptoms. Because the ALJ found plaintiff's allegations not credible, she could properly reject these derivative reports. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995).

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that commissioner's decision denying plaintiff Dorothy Brueggen's application for disability insurance benefits be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this report.

W.D.Wis.,2006.

Brueggen v. Barnhart

Not Reported in F.Supp.2d, 2006 WL 5999614 (W.D.Wis.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.